UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIMOTHY A. ENDRE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:17-cv-04446-JRS-MJD |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Timothy A. Endre, an inmate at Greenville Federal Correctional Institution in Greenville, Illinois, alleges that Bureau of Prison ("BOP") employees failed to protect him from sexual assault by another inmate while he was incarcerated at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"). Mr. Endre brings this suit under the Federal Tort Claims Act ("FTCA") against the United States of America for money damages. The United States seeks resolution of this action through summary judgment. For the reasons explained below, the motion for summary judgment, dkt [43], is **denied**.

**I.
Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse

1

party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary

judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

**II.
Factual Background**

**A. Policies at FCC Terre Haute Regarding Sexual Assault and Census Counts**

Pursuant to federal law, the BOP has implemented policies and procedures to prevent and respond to the problem of prison sexual assault. *See* 42 U.S.C. § 30307(a)–(b) (requiring the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape" that "shall apply to the Federal Bureau of Prisons"). In compliance with these procedures, FCC Terre Haute underwent a Prison Rape Elimination Act ("PREA") audit in June 2016. The auditor determined that FCC Terre Haute complied with all applicable PREA standards. Dkt. 44. Mr. Endre disputes the accuracy of the audit report's conclusions. Dkt. 51.

Upon arrival at FCC Terre Haute, inmates receive a copy of the facility's handbook. Dkt. 43-1. This handbook contains a section entitled "Sexually Abusive Behavior Prevention and Intervention: An Overview for Offenders (Mar. 2014)." *Id.* It informs inmates that "[w]hile you are incarcerated, *no one has the right to pressure you to engage in sexual acts.*" *Id.* (emphasis in original). It informs inmates that if they feel threatened, they should "approach any staff member and ask for assistance." *Id.* It also informs them that if they are sexually assaulted, they should "*report it immediately to staff* who will offer you protection from the assailant." *Id.* (emphasis in original). They should also "*see medical staff BEFORE [they] shower, wash, drink, eat, change clothing, or use the bathroom.*" *Id.* (emphasis in original).

Inmates are not required to name their assailant when making a report or to obtain

protection. If the inmate is "not comfortable talking with staff[,]" they have five "other means to confidential[ly] report sexually abusive behavior": they can write directly to the Warden, Regional Director or Director using "special mail procedures"; they can file an administrative remedy request at either the facility or Regional level; they can write to the Office of the Inspector General ("OIG"); they can email OIG through the TRULINCS email system; or they can have another person make the report on their behalf through the BOP's public website. *Id.*

Mr. Endre's unsworn response to the defendant's motion for summary judgment states that there is no evidence that he received a handbook when he arrived at FCC Terre Haute. Dkt. 51. During his deposition, he testified that he did not go to orientation until sometime in August 2015. Dkt. 48 at 9.

FCC Terre Haute has put into place post orders and special instructions that inform prison guards how to conduct official counts, census counts, emergency counts, and other security procedures. Mr. Endre alleges that he was attacked during census counts while he was housed in general population. A document titled "Special Instructions General Population Housing Units" states that during census counts "[a]ll inmates in the housing units will be secured in their assigned cell." Dkt. 61-1 at 38.

**B. Mr. Endre's Incarceration at Terre Haute and Alleged Abuse**

Mr. Endre was housed at FCC Terre Haute starting on July 9, 2015, and throughout the events that gave rise to this lawsuit. Prior to Mr. Endre's arrival at FCC Terre Haute, his criminal defense attorney advised him to "check in" to protective custody when he got there because he was a sex offender. Dkt. 48 at 11.[1] Mr. Endre inquired about that upon arrival, and a BOP

---

[1] The fact section relies heavily on Mr. Endre's deposition testimony. Mr. Endre disputes the admissibility of his deposition testimony because he did not sign the transcript, but he does not point to any errors or inaccuracies in the transcript. Dkt. 51 at 12. In ruling on this motion, the

staff member told him that he could check into protective custody if he wished to do so, but that there were numerous other sex offenders in the general population. Mr. Endre decided "I guess I'm going to try" to remain in general population. *Id.*

Upon arrival at FCC Terre Haute, Mr. Endre had a clinical encounter with a mental health service provider, Dr. Megan Stevens, who discussed the PREA requirements and the BOP Sexual Abuse Prevention Policy with Mr. Endre. Dkt. 43-7. To determine whether Mr. Endre would be at an increased risk of becoming a victim of sexual assault, Dr. Stevens asked whether he had previously been a victim of sexual assault either in prison or in the community. Although Mr. Endre did not admit being the victim of any prior sexual assault, Dr. Stevens had access to records that revealed past abuse. *Id.*; Dkt. 48 at 15. At some point, Mr. Endre told Dr. Stevens that he had been sexually assaulted as a child, but his mother did not believe him when he reported it to her. Dkt. 48 at 14-15.

While housed in a general population housing unit, Mr. Endre met another inmate who lived in the same unit but was assigned to a different cell from Mr. Endre. *Id.* at 16. The other inmate visited Mr. Endre in Mr. Endre's cell while Mr. Endre's cellmate was away from the cell. *Id.* at 7. The other inmate offered to shave Mr. Endre's back so that the other inmate could give Mr. Endre a massage. *Id.* at 7-8. Mr. Endre consented to the shave, but during the shaving process, the other inmate pulled Mr. Endre's boxers down and began to fondle him. *Id.* Mr. Endre did not call an officer for assistance or press the panic button in his cell, even though he knew that an officer would respond if he did. *Id.* at 8-9. This interaction continued for

---

Court would be obligated to disregard any change in substance that contradicted the transcript, unless it [could] plausibly be represented as the correction of an error in transcription, such as dropping a "not." *See Thorn v. Sundstrand Aero Corp.,* 207 F.3d 383, 389 (7th Cir. 2000). Therefore, the Court will consider the unsigned transcript as evidence.

approximately 20 minutes without anyone witnessing it, after which time Mr. Endre did not tell anyone what had happened. *Id.* at 9. Mr. Endre did not file an administrative remedy request about the incident, nor did he ask to be moved to a different housing unit or placed in protective custody or report the incident to Dr. Stevens when he met with her. *Id.* at 12; Dkt. 43-7.

On August 4, 2015, the other inmate was again shaving Mr. Endre when he penetrated Mr. Endre's anus with his finger, tongue, and penis. Dkt. 48 at 11. Mr. Endre said "no," but he did not call for help. The other inmate continued the assault, causing Mr. Endre injury to his anus. Mr. Endre did not seek any medical treatment for this injury, however, nor did he tell anyone what had happened. *Id.* at 11-12. Three days later, on August 7, 2015, Mr. Endre had another clinical encounter with Dr. Stevens, but he did not report the assaults or appear to be in any distress. *Id.* at 13; Dkt. 43-7. The assaults continued on a daily basis during census counts. Dkt. 48 at 11. Mr. Endre contends that BOP staff should not have allowed the other inmate to be locked in Mr. Endre's cell during these count times. *Id.* at 34. Mr. Endre is not aware that any BOP staff member ever saw one of the alleged assaults taking place, or that the other inmate ever told anyone what he was doing to Mr. Endre. *Id.* at 48.

On or about August 28, 2015, Mr. Endre enrolled in the Life Connections Program (LCP), a faith-based program intended to reduce recidivism in which all participants live in a particular unit. Dkt. 48 at 10. Mr. Endre did this in part to get away from the other inmate. After Mr. Endre moved to the program's unit, he did not experience any further assaults. *Id.*

On September 15, 2015, Mr. Endre had another clinical contact with Dr. Stevens. He appeared to her to be doing well in his new housing unit, and he did not report the assaults to her at that time. *Id.* at 13; dkt. 43-7. On the contrary, he "put[ ] on a front" because he didn't want her "to know [his] true feelings." Dkt. 48 at 13.

### C. The Report, Investigation, and Transfer of the Alleged Assailant

On or about October 29, 2015, Mr. Endre learned that the other inmate was moving to a unit adjacent to Mr. Endre's unit. *Id.* at 15. Mr. Endre feared that he would soon have more contact with the other inmate. *Id.* The following morning, on October 30, 2015, Mr. Endre had a clinical encounter with Dr. Stevens in which he told her he had been sexually assaulted. *Id.* at 16.

In accordance with policy, the facility initiated an investigation. *Id.* at 16; dkt. 43-1; dkt. 43-7. The alleged assailant was removed from his housing unit and placed in Administrative Detention. Dkt. 43-1. The investigation included separate, confidential interviews with both inmates and medical assessments of both inmates. In Mr. Endre's interview, he told the investigator that the other inmate had told him that the staff already knew what was happening, did not care, and would not believe Mr. Endre if he did report the assaults because Mr. Endre was himself a sex offender. In the other inmate's interview, he denied ever engaging in sexual contact with Mr. Endre. *Id.* The medical assessments of both inmates did not show that either had any injuries. *Id.* Due to the delay in reporting, no video or physical evidence could be recovered.[2] *Id.*

When asked why he did not report the assaults sooner, Mr. Endre stated that when he was a child, he experienced sexual abuse, and when he reported that abuse to his mother, she did not believe him. Dkt. 48 at 14. He stated that experience made him reluctant to report the other inmate's assaults. *Id.* Mr. Endre stated that what finally drove him to report the assaults

---

[2] Mr. Endre's unsworn response argues that documents produced by the defendant in discovery indicate that video evidence was reviewed during the PREA investigation. Dkt. 51 at 3-4. The Court has reviewed the documents, dkt. 62-1, and finds no reference to the existence of video evidence.

was learning that the other inmate would be moving closer to his housing unit: "I panicked and I decided I needed to tell somebody something because I wasn't going to go through it again." *Id.* at 16.

On November 24, 2015, the investigation was closed with a finding of unsubstantiated. Dkt. 43-1. The other inmate was transferred to another facility, and he has a separtee order in his file ensuring he will not be housed in the same facility as Mr. Endre in the future. *Id*. After Mr. Endre made his report to Dr. Stevens, the other inmate never again assaulted Mr. Endre or even had the opportunity to assault him. Dkt. 48 at 18.

### III.
### Discussion

The Federal Tort Claims Act (FTCA) gives district courts exclusive jurisdiction over claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. Pursuant to the FTCA, "federal inmates may bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014). State tort law of the state where the tort occurred applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008); *see also* 28 U.S.C. § 1346(b). Mr. Endre challenges the actions of BOP staff while he was incarcerated at FCC Terre Haute, which is in Indiana, thus Indiana law applies to this case.

Under Indiana law, Mr. Endre must prove (1) that the United States owed a duty to him; (2) that the United States breached that duty; and (3) that the breach proximately caused his injuries. *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016).

There can be no disagreement that the Federal Bureau of Prisons owed a duty of care to Mr. Endre during his incarceration at FCC Terre Haute. 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons . . . shall provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons . . . convicted of offenses against the United States . . . ."); *see also Gottlieb v. United States*, 624 F. Supp. 2d 1011, 1025 (S.D. Ind. 2008) ("Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health, and safety of a person in custody." (citing cases)).

Although it is undisputed that no guards were previously aware that the other inmate posed a risk to Mr. Endre and that no guards witnessed the attacks, Mr. Endre contends that guards violated BOP policy when they locked him in his cell with the other inmate during census counts. The United States disputes that failure to follow an internal policy can establish a breach of the standard of care, citing *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894-95 (Ind. 2002). Dkt. 77 at 2. But that case involved a dispute about jury instructions regarding internal policies, rather than the admissibility of those policies. The Indiana Supreme Court held that a portion of a jury instruction related to Wal-Mart's internal policies was improper because it "told the jurors that because Wal-Mart has established certain rules and policies, those rules and policies are evidence of the degree of care recognized by Wal-Mart as ordinary care." *Id*. at 894. But the Indiana Supreme Court also cited multiple cases and treatises in support of the proposition that internal policies are admissible and relevant to the question of what the standard of care is in a particular case, even though those polices do not set the standard of

care. *Id.*; *Gannon v. Menard, Inc.*, 2019 WL 7584294, at *8 (S.D. Ind. Aug. 26, 2019) (citing *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894-95 (Ind. 2002)). Failure to follow an internal policy does not establish *per se* negligence, but internal policies can be considered when deciding whether reasonable care was taken in a particular case.

The United States provides the affidavit of Associate Warden Gary Swaney who attests that census counts are not conducted to prevent sexual assault or ensure inmate safety but are instead designed to prevent absenteeism from prison jobs. Dkt. 77 at 9-10; dkt. 77-1. Neither Associate Warden Swaney's affidavit, nor any other evidence produced by the United States, addresses the purpose of the special instruction's requirement that inmates be secured in their assigned cells during census counts. The United States contends that "[t]here is nothing foreseeably dangerous about inmates being locked in a cell together." Dkt. 77 at 10, n7. If this is true, why does the BOP's policy on census counts require inmates to be secured in their assigned cell? Associate Warden Swaney's affidavit does not address this requirement.

The United States cites deliberate indifference cases, such as *Ramos v. Hamblin*, 840 F. 3d 442 (2016), for the proposition that an inmate's ability to complain about a cellmate better promotes inmate safety than a potentially unworkable requirement that vulnerable inmates not be assigned sex offenders as cell mates. Dkt. 77 at 10, n7. While it is true that Mr. Endre would likely not succeed on a deliberate indifference claim in the context of the Eighth Amendment because he has not shown that any guard witnessed any assault or knew of the particular risk presented by Mr. Endre's attacker, the standard for proving negligence is lower. A plaintiff who proves only negligence in an Eighth Amendment case fails. But here, Mr. Endre's claim is only of negligence so he must show that the United States breached a duty and that the breach proximately caused his injuries. Furthermore, the plaintiff in *Ramos* was assaulted by his cellmate and therefore the case

did not involve any potential negligence by guards allowing the two inmates to be locked in the same cell.

The United States also cites a prior case from this Court granting summary judgment in an FTCA case where the plaintiff failed to demonstrate that guards had any prior knowledge of a problem between the aggressor and the victim. *Millbrook v. United States*, No. 2:10-CV-245-WTL-WGH, 2012 WL 1014977, at *6 (S.D. Ind. Mar. 23, 2012). But that case did not involve the alleged failure to comply with any BOP policy.

In *Keller v. U.S.*, 771 F. 3d 1021 (7th Cir. 2014), the Seventh Circuit reversed the district court's grant of summary judgment in an FTCA case similar to this case. Mr. Keller alleged that guards failed to protect him from an assault by another inmate because they were lazy and failed to follow a policy requiring them to monitor certain areas of the yard. The United States produced a heavily redacted policy that suggested guards were required to monitor specific areas of the yard.

The United States raised the affirmative defense that guards patrolling the yard were engaged in a discretionary function. The Seventh Circuit rejected that argument because there was no evidence in the record that guards were making policy choices when they failed to monitor the area of the yard in which Mr. Keller was assaulted. *Id.* at 1025. Although *Keller* dealt with the discretionary function exception which is not at issue here,[3] it makes clear that

---

[3] The United States raised the defense of discretionary function in response to Mr. Endre's argument that guards are trained to identify the signs of sexual assault and therefore they must have known he was being assaulted, even though no guard ever witnessed an assault. The United States cites unpublished cases from the District of New Mexico and the Eastern District of North Carolina to support its argument that, "[b]ecause the detection and prevention of sexual assault in prison is left to the discretion of the Bureau of Prisons, any decision that a hypothetical BOP staff member would have made if he detected a sign of assault falls within the discretionary function exception to the FTCA, barring Plaintiff's claim." Dkt. 52 at 8. The Court's denial of summary judgment does not rest on Mr. Endre's assertion that guards were required by their PREA training to take mandatory action to respond to his assaults. Instead, summary judgment is denied because material questions of fact remain regarding the purpose of the special instruction's requirement

summary judgment would be inappropriate where a mandatory prison policy provides evidence a jury could reasonably rely on to find that the United States breached its duty to protect inmates.

Construing the facts in the light most favorable to Mr. Endre as the non-movant, the United States has not demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law as to Mr. Endre's FTCA. While it is a close call, there is a dispute of material fact as to whether guards breached their duty to Mr. Endre when they failed to ensure that inmates were secured in their assigned cells for census count and whether that breach, if it occurred, was a proximate cause of Mr. Endre's injuries.

## IV.
## Conclusion

For the reasons stated in this Order, the defendant's motion for summary judgment, dkt. [43], is **denied**.

Because it is the Court's preference that Mr. Endre be represented by counsel for trial, the Court will attempt to recruit counsel to represent him. Mr. Endre shall have **through April 27, 2020,** in which to object to the recruitment of counsel on his behalf.

Once counsel has appeared for Mr. Endre, the Magistrate Judge is requested to set this matter for a telephonic status conference to discuss what further development is necessary for trial and whether the case is amenable to settlement.

**IT IS SO ORDERED**.

---

that inmates be secured in their assigned cell during census count and whether guards' failure to comply with this instruction breached a duty to protect Mr. Endre, proximately causing his assaults. The United States did not raise a discretionary function defense to the special instruction's requirement that inmates be secured in their in their assigned cell during census count, and it is not obvious to the Court that the requirement allowed for any discretion in its implementation.

Date: 3/30/2020

_James R. Sweeney II_
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TIMOTHY A. ENDRE
12132-028
GREENVILLE - FCI
GREENVILLE FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 5000
GREENVILLE, IL 62246

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
rachana.fischer@usdoj.gov

Lara K. Langeneckert
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lara.langeneckert@usdoj.gov

Magistrate Judge Mark J. Dinsmore