UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIMOTHY A. ENDRE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:17-cv-04446-JRS-MJD |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**Findings of Fact and Conclusions of Law**

Plaintiff Timothy A. Endre brought this Federal Tort Claims Act suit against the United States of America, alleging that the United States was negligent in failing to protect him from sexual assault by another inmate while he was incarcerated at the United States Penitentiary at Terre Haute, Indiana (USP Terre Haute). The Court conducted a bench trial on January 19, 2021, in Indianapolis, Indiana. Mr. Endre was present in person and by counsel.[1] The United States of America was present by counsel.

Federal Rule of Civil Procedure 52(a) directs the Court to separately set out its findings of fact and conclusions of law in an opinion or a memorandum of decision. The following are the Court's findings of fact and conclusions of law required by Rule 52(a). To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

---

[1] The Court greatly appreciates the capable representation that volunteer counsel, Diane Menashe and Meredith Wood of Ice Miller, provided to the plaintiff.

# I.
# Findings of Fact

The following facts are based on the Court's credibility determinations of the various witnesses' testimonies and the exhibits admitted into evidence. Some factors the Court considered in determining the credibility of the witnesses were the demeanor and candor of the witness while testifying, the inherent plausibility of the witness's account, the consistencies and inconsistencies between the witness's present and prior statements, and whether the witness had bias, prejudice or other reason to lie or slant the testimony.

### A. Mr. Endre's Background and Arrival at USP-Terre Haute

In 2015, Mr. Endre was sentenced to imprisonment at the Bureau of Prisons ("BOP") after pleading guilty to Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). (*United States v. Endre,* No. 1:14-cr-108-SEB-MJD.) On July 9, 2015, Mr. Endre arrived at USP-Terre Haute, where he was housed in Unit D-2 from July 9, 2015 to August 28, 2015.

Mr. Endre was a victim of sexual abuse during his childhood. Although he did not report this childhood sex abuse at the time it occurred, he later reported the abuse to his mother, who did not believe him. He also reported it to the United States' Pre-Trial Officer who interviewed him for purposes of the Pre-Sentence Investigation Report in Case No. 1:14-cr-108-SEB-MJD.

Because he was sentenced pursuant to a sex offense, Mr. Endre was concerned about the risk of violence and sexual assault presented to him in prison. For this reason, he attempted to check into protective custody when he arrived at USP Terre Haute. However, he was reassured that there were numerous sex offenders in the general population, which gave him the impression that it was safe for him to remain in general population. Mr. Endre testified, however, that he

2

requested to be placed in general population and that he feared being placed in the Special Housing Unit (SHU) due in part to it being cramped and locked down 24 hours-a-day.

Mr. Endre met with Dr. Megan Stevens, a BOP psychologist, on July 9, 2015. To determine whether Mr. Endre would be at an increased risk of becoming a victim of sexual assault, Dr. Stevens asked whether he had previously been a victim of sexual assault in prison or in the community. Although Mr. Endre recalls having informed Dr. Stevens of his prior childhood sexual abuse, the records reflect that he denied a history of sexual abuse. Dr. Stevens reviewed records that revealed Mr. Ende's prior abuse, but her own records do not indicate that she followed up with Mr. Endre regarding why he denied the abuse. Dr. Stevens concluded that Mr. Endre could be placed in general population and that he should receive psychological services on a regular basis. Based on his fear of being physically or sexually assaulted in prison, Mr. Endre rarely left his assigned cell.

**B. The Prison Rape Elimination Act (PREA) and Its Implementation by the Bureau of Prisons**

The Bureau of Prisons has issued "Program Statement 5324.12: Sexually Abusive Behavior Prevention and Intervention Program," which sets forth procedures to prevent and deter sexually abusive behavior. The Program Statement addresses topics such as supervision and monitoring, inmate education, staff training, inmate screening, reporting, investigations, discipline, and audits. Staff are trained on how to handle reports of sexual assault.

Each day, BOP officers make unannounced PREA rounds at three random times of the day for the specific purpose of detecting and deterring sexual assault. Inmates at USP Terre Haute attend orientation and receive an Admission and Orientation ("A&O") Handbook usually within 30 days

of arriving at the facility. Mr. Endre recalls attending orientation 30-45 days after his arrival. Mr. Endre's cell had a duress alarm button near the cell's entrance. When the duress alarm button is pushed, a light is activated in the staff office of the unit. Mr. Endre never pushed the duress alarm button in his cell. Mr. Endre first testified that he did not press the button because he never thought about it during the numerous assaults, but then said he did not press it because Mr. Bean was always standing next to or in front of the button and because the response would have been slow.

Pursuant to Program Statement 5324.12: Sexually Abusive Behavior Prevention and Intervention Program § § 115.93 and 115.401 – 115.405, the correctional facility at Terre Haute undergoes an audit every three years to determine its compliance with PREA standards. The facility's June 2016 audit included a three-day on-site visit, interviews with 50 inmates, and a review of the facility's PREA documentation. The auditor found that the facility was in compliance with all applicable PREA standards.

### C. Census Counts

USP Terre Haute has written and posted orders and special instructions, titled "Special Instructions General Population Housing Units," that inform prison guards how to conduct official counts, census counts, emergency counts, and other security procedures. Census counts are conducted at approximately 8:30 A.M. and 12:30 P.M. Monday through Friday to ensure inmates are reporting to their assigned work details. The special instructions required inmates to be secured in their assigned cells for census counts. Violators are subject to discipline. Correctional Officer James Mumbower testified that he worked the day shift in Mr. Endre's unit in July 2015 and that

it would not have been possible for an inmate to be locked in the wrong cell repeatedly during census counts because correctional officers verified each inmate's ID during the counts. The Court finds this testimony credible.

### D. Mr. Endre's Interactions with Inmate Bean

Shortly after arriving at USP-Terre Haute, Mr. Endre met inmate Bean, who was housed in a different cell in Mr. Endre's Unit. Mr. Bean and Mr. Endre were never assigned to be cell mates. Mr. Bean was approximately 3 inches taller and 25 to 30 pounds heavier than Mr. Endre. Mr. Bean was incarcerated after pleading guilty to being a felon in possession of a handgun. When they first met, Mr. Bean said he thought Mr. Endre was cute. Mr. Endre told Mr. Bean he was not gay. The two continued to interact daily. Mr. Bean manipulated Mr. Endre into giving him his phone card and privileges. Mr. Bean was later disciplined for using Mr. Endre's phone account.

Mr. Bean began sexually abusing Mr. Endre in Mr. Endre's cell while Mr. Endre's cell mate was at work. The first assault occurred after Mr. Bean offered to shave Mr. Endre's back so that he could give Mr. Endre a massage. Mr. Endre consented to the shave, but during the shaving process, Mr. Bean pulled Mr. Endre's boxers down and began to fondle him. The nature and number of sexual assaults experienced by Mr. Endre at the hands of Mr. Bean is disputed. Mr. Endre testified that the assaults occurred daily but were witnessed by no one. The defendant argues that Mr. Endre first alleged three assaults, as the evidence shows, and only later alleged daily assaults to secure special housing privileges.

On or around August 28, 2015, Mr. Endre enrolled in the Life Connections Program (LCP), a faith-based program intended to reduce recidivism, in order to get away from Mr. Bean. As part

of the LCP, inmates live in a particular unit. After enrolling in the LCP, Mr. Endre was moved to a different housing unit away from Mr. Bean.

Mr. Endre initially did not report the sexual assaults because Mr. Bean had told him that the BOP staff were already aware of how unruly Mr. Bean was and let him do what he wanted. Mr. Bean told Mr. Endre that BOP staff would not care that Mr. Endre was being sexually assaulted because he was a sex offender. Mr. Endre believed Mr. Bean. In addition, Mr. Endre felt physically intimidated by Mr. Bean. Mr. Endre also did not initially report the sexual assaults due to the shame, humiliation, guilt, and embarrassment he felt. He believed that he deserved to be assaulted because of his prior sex offense and that no one would care or believe that he had been assaulted. Mr. Endre believed that BOP staff would not be concerned with his safety and wellbeing because he was a sex offender. Mr. Endre's delayed reporting was also due in part to his prior experience as a victim of childhood sex abuse, and in particular, the fact that he had reported the abuse to his own mother, who at the time did not believe him.

### E. Mr. Endre's Allegations and the Resulting Investigation

On or about October 29, 2015, Mr. Endre learned that Mr. Bean was moving into a unit adjacent to Mr. Endre's unit and he feared that the sexual assaults would resume. On October 30, 2015, Mr. Endre disclosed to Dr. Stevens that he had been sexually assaulted by Mr. Bean on three occasions. He testified that he felt guilt, shame, and embarrassment over the sexual assaults, and was afraid of being transferred to the SHU, which is why he did not report the full extent of the assaults until later.

6

Dr. Stevens notified the PREA Compliance Manager of the allegations and the PREA Response Protocol was initiated pursuant to Bureau of Prisons Program Statement P5324.12. It is undisputed that Mr. Endre had not disclosed the alleged assaults to any BOP staff before October 30, 2015. BOP staff initiated an investigation immediately, removing Mr. Bean from the unit and conducting investigative interviews, medical assessments, and psychological evaluations of both Mr. Endre and Mr. Bean all within the same day.

Mr. Bean was placed in administrative detention in the Special Housing Unit pending an investigation. Special Investigative Service (SIS) Officer Christopher Cordray interviewed both Mr. Endre and Mr. Bean. Mr. Endre stated during his interview that Mr. Bean had made unwanted sexual contact with Mr. Endre on three separate occasions while Mr. Bean was giving Mr. Endre massages. ~~The unwanted sexual conduct included sucking Mr. Endre's toes, masturbating Mr. Endre, and licking Mr. Endre's anus~~.

During his unsworn interview, Mr. Bean first denied knowing Mr. Endre, then stated that Mr. Endre was helping Mr. Bean prepare for his GED. Mr. Bean acknowledged being locked in Mr. Endre's cell while studying, but denied engaging in any sexual activity with Mr. Endre. Mr. Bean did not testify at the trial.

Paramedic Aaron Nimz performed medical assessments of both Mr. Endre and Mr. Bean. During Mr. Endre's medical assessment, Mr. Endre reported that he did not have any injuries. The parties dispute whether Mr. Nimz conducted a head to toe inspection of Mr. Endre. Mr. Nimz's initial report was submitted nine minutes after Mr. Endre reported for the examination. Mr. Nimz's report stated that he did not find any injuries. He also noted that Mr. Endre's hair growth appeared

normal on his lower back, but Mr. Endre replied that his hair grows fast. Mr. Nimz's medical assessment of Mr. Bean also revealed no injuries.

Dr. Stevens performed psychological evaluations of both Mr. Endre and Mr. Bean. During the evaluation, Mr. Endre stated that Mr. Bean had made sexual proposals, pressured him for sexual favors, and that some sexual contact had occurred. Dr. Stevens offered Mr. Endre access to an outside advocate, but Mr. Endre declined. She scheduled a follow-up appointment with him the next week. During Dr. Stevens' psychological evaluation of Mr. Bean, he again denied any sexual contact with Mr. Endre.

SIS Officer Cordray reviewed Mr. Endre's telephone calls as part of his investigation. There was no video evidence to review because the incidents took place over two months before Mr. Endre reported them. SIS Officer Cordray ultimately concluded that it was more likely than not that Mr. Endre was sexually assaulted, however the allegations could not be substantiated with the available evidence. Nevertheless, he recommended that Mr. Endre and Mr. Bean be separated, and that Mr. Bean be transferred to another facility. There is no dispute that Mr. Endre was not assaulted by Mr. Bean after August 28, 2015.

**F. Mr. Endre's Housing Concerns**

On December 13, 2016, Mr. Endre had a psychology appointment with Dr. Stevens. During the appointment, Mr. Endre sought a lower bunk pass due to the effects of his psychiatric medications. Dr. Stevens explained that bunk passes were outside the scope of Psychology Services.

On December 19, 2016, Mr. Endre wrote Dr. Stevens to tell her that he was planning to file a tort claim regarding the alleged sexual assault. He also told her that he was having trouble

8

sleeping in a top bunk and that his cell mate was leaving in two months. Mr. Endre testified that he could not sleep on a top bunk because many of the sexual assaults had occurred on the top bunk. He suggested that the BOP allow him to create a list of inmates with whom he would be comfortable sharing a cell.

On January 3, 2017, Mr. Endre again wrote Dr. Stevens to ask about a single cell permit and selecting his cell mate. On the same day, he sent an e-mail to the Inmate Work Assignment Coordinator to ask for help getting a single cell in which he wrote, "I am seeking a one man cell and I will be pushing it as for [sic] as I can to include the filing of a multi-million dollar tort claim." Ex. 137.

### G. Mr. Endre Files a Tort Claim and a Complaint in District Court

On April 24, 2017, Mr. Endre signed a tort claim for $50,000,300.00 related to the alleged sexual assaults by Mr. Bean. The tort claim was denied on June 9, 2017, and Mr. Endre filed the complaint initiating this action on November 30, 2017. In the complaint, Mr. Endre alleged that between July 10, 2015, and August 24, 2015, he was assaulted a minimum of four times a day for a total of 184 to 200 times. He sought compensatory damages of $50,000,300.00. Dkt. 1.

## II. Conclusions of Law

The Federal Tort Claims Act (FTCA) provides that the United States is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her employment if a private person would be liable to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

Under Indiana law, to prove negligence, a plaintiff must establish by a preponderance of the evidence that the defendant: (1) owed a duty to the plaintiff; (2) breached that duty by failing to meet the appropriate standard of care; and (3) the plaintiff suffered injury as the proximate result of the defendant's failure to perform its duty. *See Parrott v. United States,* 536 F.3d 629, 635 (7th Cir. 2008); *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016).

The Court concludes based on the evidence presented at trial that it is more likely than not that the United States did not breach a duty to Mr. Endre or proximately cause his alleged injuries. The United States' duty of care owed to federal prisoners is established by 18 U.S.C. § 4042. *See United States v. Muniz*, 374 U.S. 150, 164-65 (1963) ("the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042"). Pursuant to 18 U.S.C. § 4042, the United States owes a duty to federal inmates to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2), (3). This includes a duty to keep inmates safe from other inmates in instances where prison officials know or reasonably should know of a potential risk. *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008).

It is undisputed that no one witnessed the sexual assaults. It is also undisputed that Mr. Endre did not fear Mr. Bean when he met him. Mr. Bean was not incarcerated due to a sex offense and had no prior disciplinary history for sexual assault. Ex. 133; ex. 210. Although the BOP was aware that Mr. Endre was vulnerable to sexual assault due to his status as a sex offender

10

and his previous experience with sexual abuse as a child, the BOP had no reason to believe that Mr. Endre could not be safely housed in general population or that he needed to be kept separate from Mr. Bean. Although Mr. Endre testified that some of the assaults occurred when he was locked in his cell with Mr. Bean during census counts, the Court credits Officer Mumbower's testimony that Mr. Bean was not locked in Mr. Endre's cell. It is not credible that Mr. Bean was locked in Mr. Endre's cell by BOP staff ten times per week during the census counts that took place while he and Mr. Endre were housed in the same unit. This would entail staff ignoring both Mr. Bean's absence from his own cell and the presence of one unauthorized person in Mr. Endre's cell.

The BOP took reasonable steps at USP Terre Haute to detect and deter prison rape in 2015. The audit completed in 2016 concluded that staff were properly trained and complying with all PREA requirements. Mr. Endre had access to a duress button in his cell. When he reported the sexual assaults, BOP staff responded appropriately, and Mr. Bean did not assault Mr. Endre again. Although it may be true that Mr. Endre delayed reporting the assaults and initially underreported them out of shame and embarrassment, the BOP had no duty to independently discover the unreported sexual assaults and the failure of BOP staff to do so did not proximately cause Mr. Endre's alleged injuries.

To the extent that Mr. Endre claims that BOP staff should have detected unspecified signs of assault, those claims are barred by the discretionary function exception to the Federal Tort Claims Act which excludes from FTCA coverage "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a federal agency or an employee of the Government, whether or not the discretion involved be

11

abused." *See* 28 U.S.C. § 2680(a). To fall within this exception, the nature of the challenged act must involve "an element of judgment or choice" and be "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 322, 325 (1991). Whether and how BOP staff should go about detecting unreported sexual assaults, beyond the activities required by PREA, are questions of judgment susceptible to policy analysis and therefore cannot support an FTCA claim. The same is true of Dr. Stevens' determination that Mr. Endre could be safely housed in general population. *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) ("The determination as to where to house a federal prisoner is precisely the sort of discretionary act that falls within the discretionary function exception."); *Bailor v. Salvation Army,* 51 F.3d 678, 685 (7th Cir. 1995) (discretionary function exception applied to BOP's decision to house inmate in halfway house).

The parties' characterizations of Mr. Endre's efforts to seek a bottom bunk pass and single cell or the privilege of selecting a cell mate diverge. Mr. Endre plausibly testified that he had trouble sleeping on the top bunk due to the sexual assaults. The United States argued that Mr. Endre's attempts to obtain a bottom bunk pass and single cell were proof that his true motive for claiming he was repeatedly sexually assaulted was to obtain the housing privileges he sought. But neither characterization affects the Court's conclusion that the United States did not breach any duty to Mr. Endre or proximately cause any injury he suffered.

Because Mr. Endre has failed to establish by a preponderance of the evidence that the United States breached any duty or was the proximate cause of any injury, the Court need not consider the issue of damages. Judgment consistent with this Order and the Entry of February 16, 2018, screening Mr. Endre's amended complaint, shall now issue. Dkt. [9].

**IT IS SO ORDERED.**

Date: 3/22/2021

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TIMOTHY A. ENDRE #731145
MARION COUNTY JAIL
MARION COUNTY JAIL Inmate Mail/Parcels
40 South Alabama Street
Indianapolis, IN 46204

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
rachana.fischer@usdoj.gov

Jackson Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
taylor.kirklin@usdoj.gov

Diane Marie Menashe
ICE MILLER LLP (Columbus)
diane.menashe@icemiller.com

Meredith Wood
ICE MILLER, LLP
meredith.wood@icemiller.com